IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

IGNACIO O. LOPEZ and FRANCES LOPEZ,
husband and wife, and DIANA BARNETT,
GLORIA M. DYKES, SYLVIA M. GARCIA,
KATALINA GWINN, and IGNACIO M.
LOPEZ, their children,

    Plaintiffs,

vs.

No. CIV 99 865 BB

UNITED STATES OF AMERICA,

    Defendant.

**RICHARD L. PUGLISI**

## COMPLAINT FOR NEGLIGENT MEDICAL CARE

Plaintiffs respectfully state:

### I. Parties

1. Ignacio O. Lopez ("Mr. Lopez"), his wife, Frances Lopez ("Mrs. Lopez"), and their children Ignacio M. Lopez and Sylvia M. Garcia are citizens of New Mexico. Diana Barnett, Gloria M. Dykes, and Katalina Gwinn are citizens of Virginia, Missouri, and Colorado, respectively. Mr. and Mrs. Lopez's children are referred to hereafter collectively as the "Lopez Children."

2. The United States of America is properly served with process pursuant to Fed. R. Civ. P. 4(i). Specifically, Plaintiffs are serving a summons and complaint to the following by the method indicated:

| **By hand delivery:** | **By certified mail RRR:** | **By certified mail RRR:** |
|---|---|---|
| Hon. John Kelly | Hon. Janet Reno | Department of the Army |
| U.S. Attorney D.N.M. | U.S. Attorney General | Medical Claims Judge Advocate |
| U.S. Department of Justice | U.S. Department of Justice | **ATTN: Bradford R. Lang** |
| 201 3rd Street N.W. | 950 Pennsylvania Avenue N.W. | William Beaumont Army Medical Center |
| Suite 900 | **ATTN: Civil Division** | 5005 N. Piedras Street |
| **ATTN: Civil Division** |     **Case Classifications** | El Paso, Texas 79920-5001 |
| Albuquerque, NM 87102 | Washington D.C. 20530 | |

## II. Jurisdiction, Venue, and Choice of Law

3.     The Court has exclusive subject-matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1346(b).

4.     Venue is properly set in this Court pursuant to 28 U.S.C. § 1402(b). Mr. Lopez and Mrs. Lopez have resided together in New Mexico continuously for the last five years and currently dwell at 24134 Highway 70, Bent, New Mexico 88314.

5.     The medical malpractice laws of the State of Texas apply to this lawsuit under 28 U.S.C. § 1346(b) because the acts or omissions of medical care that Plaintiffs allege all occurred at the William Beaumont Army Medical Center in El Paso, Texas. Texas has no cap on medical malpractice damages. *See Lucas v. United States*, 757 S.W.2d 687 (Tex. 1988).

## III. Conditions Precedent

6.     Prior to filing this complaint and more than six months ago, Plaintiffs filed separate claims on Standard Form 95 with the Department of the Army (DOA) pursuant to 28 U.S.C. § 2672, 32 C.F.R. § 536.1 *et seq.*, and 28 C.F.R. § 14.1 *et seq.* The DOA made no final disposition of Plaintiffs' claims within six months, and, therefore, pursuant to 28 U.S.C. § 2675(a), Plaintiffs' claims are deemed denied and there is no other condition precedent to the filing of this lawsuit.

## IV. Background Facts

7.     Ignacio O. Lopez[1] came to the William Beaumont Army Medical Center in El Paso, Texas, on March 19, 1998, complaining of acute abdominal pain. An abdominal aortic aneurysm had been diagnosed one year previously.

---

[1] USA RET LOS (ENL) E7/SERGEANT 1ST CLASS

---

8. The doctors, nurses and other staff assisting in Mr. Lopez's medical care were each an "Employee of the Government," were each "Acting within the scope of his office or employment" within the meaning of those terms in the Federal Tort Claims Act (28 U.S.C. §§ 1346(b), 2671-80) and related regulations or rules, and the United States of America is responsible under Texas law for the actions of these doctors, nurses, and other staff.

9. Mr. Lopez was immediately admitted. An emergency laparotomy was performed in the late afternoon by Darwin D. Karr-Peterson M.D., assisted by Todd S. Robert M.D. William Kaiser M.D. was the "staff supervisor." Mr. Lopez's aneurysm was repaired with a synthetic graft.

10. Drs. Karr-Peterson and Robert left a laparotomy pad, commonly called a "lap," or sponge, in Mr. Lopez's peritoneal cavity when they closed his abdomen. The nurses miscounted the laps used in the operation, and reported, wrongly, that the lap count was "correct."

11. Several aspects of the operation suggest that Dr. Karr-Peterson was less than familiar with the usually routine operation for aortic aneurysm:

    11.1    the use of a woven graft;

    11.2    the lack of mention of preclotting a graft to avoid immediate bleeding;

    11.3    the operative report's description of subcutaneous heparin (heparin is not used subcutaneously for thromboprophylaxis by vascular surgeons);

    11.4    the description of the graft as a # 16 *French* "interposition" is equally anomalous (Vascular grafts are not measured by the French sizing system, unlike some tubes used in general, not vascular, surgery. This suggests that Dr. Karr-Peterson was much more used to general surgical than vascular surgical procedures.); and

    11.5    last, and most alarming, was the inordinate amount of bloodloss during the procedure, necessitating 5 units of blood and platelet transfusion—the operation Mr. Lopez received can often be performed with no blood

transfusion whatsoever, especially in men and unusual degrees of blood loss in these sorts of operations typically indicate inexperience and lack of technical expertise in the surgeon.

12. A laparotomy pad is a considerable size—*14 square inches with a 7 inch long blue string in Mr. Lopez's case*.

13. Mr. Lopez was readmitted to the William Beaumont Army Medical Center on April 7, 1998, complaining of the recent onset of malaise, fatigue, high fever, and chills. His wife noted that he had a rash on his abdomen. Mr. Lopez's admission CBC showed neutropenia, accompanied by anemia and thrombocytopenia, but this was apparently missed by the physicians because there is no discussion of it in the records.

14. The lap left in Mr. Lopez by his surgeons was shown on a CT scan *the day of admission*, but there was a two-day delay before it was removed.

15. The intern on call, Dr. Smith, saw Mr. Lopez because of high fever in the early hours of April 8. Dr. Smith ordered a repeat CBC, and noted that Mr. Lopez's neutropenia had worsened, and his anemia and thrombocytopenia had likewise progressed.

16. The regular progress note on April 8, written by Dr. Gourley, is not only silent as to discussion of Mr. Lopez's hematology problems, but fails even to comment on their existence, and a hematology consult was not obtained until April 10, two days later. Mr. Lopez's physicians failed to timely recognize that he had a potentially life-threatening hematologic abnormality.

17. By April 9, Dr. Gourley's progress note commented on a "diffuse macular rash over the abdomen," and documented that the white blood count had fallen to the alarmingly low level of 1.5. Remarkably, despite Mr. Lopez's recent vascular surgery, the new plastic graft in his aorta, and

the presence of the foreign body on his CT scan, Dr. Gourley's progress note of April 9 continues to label Mr. Lopez's diagnosis as "FUO" - fever *of unknown origin*! This proves either that communication among the physicians attending Mr. Lopez was inadequate, or that there was a woeful lack of focus and attention to the overwhelmingly likely cause of the problem. Either no-one was telling Dr. Gourley what was going on, or no-one senior was paying attention to Mr. Lopez.

18. Eventually, after this inordinate delay of two days, Mr. Lopez was returned to the operating room on April 9, 1998, and the lap was removed by Dr. Karr-Peterson *through a different incision* in Mr. Lopez's abdomen. For reasons that are as yet unclear, a replacement surgical pathology report was issued 6 days after removal of the lap, on April 15, 1998. Culture of the fluid around the lap grew out methicillin-resistant Staph. Aureus ("MRSA").

19. By April 11, 1998, Mr. Lopez's "rash" had become much worse, covering diffusely his chest, back, and legs, and diagnostic of erythema multiforme. He had also developed remarkable painful blisters and open sores on his penis, and his scrotum was grotesquely swollen. The blistering subsequently spread to his mouth, hands, nipples, and other parts of his body, completing the clinical picture of Stevens-Johnson syndrome, a horrible hypersensitivity reaction to either the MRSA infection or a drug used to treat it. Needless to say, both of these putative causes were the end result Dr. Karr-Peterson's leaving the lap in Mr. Lopez's peritoneal cavity on March 19, 1998.

20. In addition to the extensive rash and blistering, Mr. Lopez became grossly swollen, he lost his fingernails and toenails, the skin on the tips of his fingers peeled off, his nipples peeled off, and much of the skin on his back, chest, and legs sloughed off. The blistering in his mouth became so bad that Mrs. Lopez reports that when she tried to feed her husband the spoon would

come out covered with blood and fragments of mucous membrane. When Mr. Lopez's son tried to shave his father, his facial skin sloughed off with the razor.

21.     Mr. Lopez had numerous consults with specialists in opthalmology, dermatology, hematology-oncology, and psychiatry because of his predicament.

22.     In addition to the Stevens-Johnson syndrome, Mr. Lopez's bone marrow was severely depressed, and he developed a condition known as pancytopenia. His doctors considered this problem also to be secondary either to his infection or to the drug treatment he received after readmission on April 7, 1998. As a result, Mr. Lopez underwent the trauma of being placed in reverse isolation to try to obviate further hospital-acquired infection. He was given several drugs to induce his hemopoietic system to return to normal.

23.     Mr. Lopez's infection from the lap was the likelier cause of the Stevens-Johnson syndrome and bone marrow depression, since Mr. Lopez had begun to have a rash before readmission to the hospital, and before exposure to the antibiotics.

24.     The unconscionable delay in removing the lap and draining the infection worsened the two problems substantially, increasing the immediate and long term psychological impact, and increasing both the mental and physical scarring resulting from the iatrogenic skin disease.

25.     Eventually, Mr. Lopez's condition improved to the point that he was able to walk to the bathroom. He remembers well that event because it was the first time that he was able to look at himself in the mirror. When he saw how his face and body had been ravaged, he sank into a severe depression. A psychiatrist was consulted and Mr. Lopez required the antidepressant drug Zoloft, which he continues to take today.

26.     Finally, on April 25, 1998, Mr. Lopez was discharged home.

27.     Mr. Lopez has permanent scarring all over his body and continues to suffer significant skin discoloration. Prior to March 1998, he was actively involved in running a family grocery store in Las Cruces, New Mexico. Since then, however, he has not been able to return to work.

28.     Mr. Lopez says that he now feels "ugly" and is uncomfortable in social settings because his physical deformities are so obvious. He is loathe to go out in public, and, in fact, leaves his home infrequently.

29.     Mr. Lopez is extremely angry over what happened to him. He has fits of great anger, deep grief over his loss, and, most incapacitating, ultimately, a deep sense of hopelessness. His feelings affect his relationship with his wife and their five grown children. He does not feel attractive to his wife and has a difficult time opening up to her emotionally or physically. Mr. Lopez has been close to his children, but now Mr. Lopez states that he is unable to get past his cycle of feelings and maintain the kinds of relations he had with his children previously. His children confirm that their father is not the same person since he has gone through this horrible ordeal and they are not able to have the same loving, supportive relations because Mr. Lopez is just simply not available emotionally.

30.     There is potentially an even more severe physical problem. The lap pad that was left in Mr. Lopez caused a difficult-to-treat bacterial infection in close proximity to the plastic graft in his aorta. Such grafts are notoriously infectable, and such infections can present months and years after the initial operation. Should this occur, Mr. Lopez would be at high risk of losing his life or his legs.

31. All medical records detailing Mr. Lopez's care and his injuries are in the possession of the United States of America and are primarily located at the William Beaumont Army Medical Center.

## Count I: Negligence

32. Mr. Lopez's injuries proximately caused by the United States of America's doctors, nurses, and other staff were avoidable altogether had the laps been correctly counted, and the surgeons recognized that they were leaving a foreign body the size of a small towel in Mr. Lopez's abdomen. The failure to remove the lap or to correctly count the laps was, of course, patent negligence.

33. Mr. Lopez's injuries were also worsened substantially by the desperately slow and unfocused approach of the United States of America's doctors, nurses, and staff to an obvious clinical problem. He has now gone several months without developing an infection in his aortic graft, and hopefully will not, but it is too early to say for sure that this will not happen. The fear of that possibility has compounded his severe depression.

34. Because of Mr. Lopez's injuries, Mrs. Lopez has lost Mr. Lopez's comfort and society, for which Texas law allows her to recover damages.

35. Because of Mr. Lopez's injuries, the Lopez Children have lost Mr. Lopez's guidance and society, for which Texas law allows them to recover damages.

WHEREFORE, Plaintiffs pray that after trial on the merits, the Court award them their damages, together with allowable interest and reasonable costs, against the United States of America.

Respectfully submitted,

Philip Craig Snyder
Attorney for Plaintiffs
Post Office Box 37188
Albuquerque, New Mexico 87176-7188
505-881-3000
505-881-3344 (fax)